UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**United States of America**

**v.**

**Quadrant Magnetics LLC et al.**

**No. 3:22-CR-88-DJH**

**QUADRANT MAGNETICS LLC'S MOTION TO STRIKE ALL TESTIMONY
AND EVIDENCE RELATING TO GE AVIATION, OR IN THE ALTERNATIVE,
RECALL ALL WITNESSES AND OTHER RELIEF TO REMEDY UNTIMELY
DISCLOSURE OF JENCKS AND EXCULPATORY INFORMATION**

On Friday afternoon, March 14, 2025, after the first week of trial, the government disclosed

13,600 pages of material to Quadrant Magnetics LLC ("Quadrant"). The material includes new

documents untimely disclosed under the Jencks Act as well as under *Brady*, *Giglio*, and their prog-

eny. The government concedes the production "may contain *Jencks* statements by GE Aviation

witnesses" and concedes those witnesses may need to be recalled. (D.N. 360, PageID.5633.)

The material is of two types. *First* are documents concerning another GE Aviation supplier,

Adams Magnetics ("Adams"). At the same time as Quadrant's purported conspiracy to defraud

GE Aviation and export its ITAR-controlled technical data, GE Aviation was receiving quotes for

part number FP24018P1 from Adams. Adams, in turn, repeatedly sought quotes from Chinese

companies, including X-Mag. As part of these transactions, Adams sent GE Aviation's alleged

"technical data" to X-Mag in China with GE Aviation's knowledge and consent. Likewise, Adams

supplied "technical data" to Chinese manufacturers and provided Chinese-sourced magnets for a

different purportedly ITAR- or DFARS-controlled magnet with GE Aviation's knowledge and

consent. These late-produced documents corroborate Quadrant's defenses that (1) GE Aviation

knew and approved of Quadrant's actions as part of an ongoing business relationship, thus negating

any bad intent on Quadrant's part; and (2) Quadrant's 2017 letter to GE Aviation and GIDEP

submissions were not intended to mislead GE Aviation or the government; instead, they were written at GE Aviation's direction as part of its efforts to deflect blame onto Quadrant for what GE believe to be its central role in the alleged criminal conspiracy. Had this information been timely disclosed, Quadrant would have used it in its opening statement and to cross-examine FBI Special Agent Andrew Burden, NCIS Special Agent James McCartney, and GE Aviation witnesses Simon Lopez, Marvin Barga, Ronald Boeckman, and Jay Babler.

Second are documents from Electron Energy Corporation. After the matters with Quadrant (and Adams and perhaps others) arose in 2017, GE Aviation explored sourcing the FP24018P1 magnet from Electron Energy. The late-produced documents show that GE Aviation continued to view the magnet as not-ITAR controlled, and the details in the requests for quotation and the like show that the magnets would not be DFARS-controlled either. Those documents corroborate Quadrant's defenses on exactly those points. Quadrant would have used this information in its opening statement as well and to cross-examine Electron Energy employee Steven Walmer at his trial-substitute deposition.

Quadrant wants to continue trying this case here and now. It believes that can be done if this untimely disclosure is appropriately remedied. We offer the following three remedies for the Court's consideration:

**Option 1**. The Court will strike all testimony and evidence in the case concerning GE Aviation and instruct the jury that it must disregard any of the evidence previously admitted. This will include any evidence concerning Quadrant's August 7, 2017 letter to GE Aviation and the GIDEP notices. The Court also will strike the testimony of Mr. Walmer.

**Option 2.** The Court will permit Quadrant to (i) present a new opening statement to the jury; (ii) recall the witnesses who have testified for additional cross-examination; (iii) strike the

testimony of Mr. Walmer, who cannot be feasibly recalled during trial; (iv) order the immediate disclosure of any additional Jencks, *Brady*, *Giglio*, and other such material; and (v) instruct the jury that the Court is restarting the case because the government failed to produce relevant records in a timely manner as the law requires.

**Option 3.** The Court will declare a mistrial.

## BACKGROUND

Quadrant is charged with one count of conspiracy, one count of wire fraud, and four counts of violating the ITAR. (D.N. 73.) The indictment's conspiracy count alleges that Quadrant conspired to knowingly and willfully export ITAR-controlled technical data, fraudulently and knowingly misrepresent and conceal the Chinese origin of its magnets in violation of the DFARS specialty metals clause, and knowingly and willfully make a false statement under 18 U.S.C. § 1001. (*Id.* ¶ 16.) The indictment alleges among its manner-and-means that the defendants "obtained ITAR-controlled technical data from U.S. Company 1 [GE Aviation]" (*id.* ¶ 17(b)); the defendants emailed data to X-Mag in China (*id.* ¶ 17(c)); the data from GE Aviation was used to make the magnets (*id.* ¶ 17(d)); the defendants repackaged and shipped the magnets to GE Aviation (*id.*); and the defendants misrepresented and concealed from GE Aviation the origin of the magnets (*id.* ¶ 17(e)). An alleged overt act of the conspiracy is the defendants' creation of a GIDEP Problem Advisory for the FP24018P1 magnet (*id.* ¶ 18(b)).

Trial started on March 10, after a week-long continuance due to the government's latent production of roughly 14,000 pages of Jencks and *Brady* material. The first words the government told the jury were these: "Good afternoon, ladies and gentlemen. Telling lies to make a profit, that's what [this] case is about." (1 Trial Tr. 156:8–9.[1]) The government described Quadrant's

---

[1] All transcript citations are to the drafts circulated by the court reporter.

actions as a "long running Chinese production scheme." (*Id.* 157:4–5.) The government asserted that "[w]itnesses who worked for Quadrant's defense customers will testify that they would not have been okay with Quadrant sending their drawings to China but they never knew because Quadrant never told them." (*Id.* 163:21–24.) The government framed the GE Aviation relationship thus: "in 2017, GE Aviation told Quadrant that its Chinese production scheme was a problem for defense business." (*Id.* 166:10–12.)

Since opening statements, six government witnesses have testified: FBI Special Agent Andrew Burden, NCIS Special Agent James McCartney, and four GE employees, Simon Lopez, Marvin Barga, Ronald Boeckman, and Jay Babler. In addition, Electron Energy Corporation employee Steven Walmer testified by Rule 15 deposition in late February, and the government will likely seek leave to play the video of his deposition to the jury. The gist of their direct testimony is that GE Aviation discovered to its surprise in 2017 that Quadrant had been sourcing its magnets from China, particularly the FP24018P1 magnet, and that Quadrant provided conflicting and ultimately false representations to GE Aviation on that subject. The gist of the cross-examination testimony has been admissions that Quadrant had told GE Aviation for years about the origin of its magnets, and that GE Aviation lured and strong-armed Quadrant into signing GE-prepared letters and forms to attempt to cover up GE Aviation's self-perceived malfeasance and shift blame to a smaller and less-resourced company.

On Friday morning, March 14, the government informed Quadrant that it had failed to produce Jencks material and other responsive records for witnesses who had testified and been released by the Court. Later that day, at 12:40 PM, the government began the process of sending those documents to Quadrant. Over the course of Friday and Saturday, counsel for Quadrant had

to request additional files from the government to conduct a full review, including missing audio files and Excel spreadsheets. (The government did timely respond to such requests.)

### 1.  Adams Magnetics.

Through significant effort that has distracted from its ability to otherwise prepare for trial, Quadrant has completed an initial first-pass review of the 13,600 pages.[2] Most of the production consists of documents from Adams Magnetics in Elizabethtown, Kentucky.[3] Together, they show GE Aviation engaging in a remarkably similar course of conduct with Adams. The magnets at issue are, here too, FP24018P1, as well as another allegedly ITAR- and DFARS-controlled magnet, 36A220770 (also called 40C0147).

As early as March 2010, Adams sought a quote and sent a technical drawing of a different part, 36A228360, to X-Mag and its owner. *See* Ex. 1 (ADAMS0005634, -5635).[4] In December 2010, Marvin Barga inquired on the status of an Adams quote for this part; Adams's Meg Langford responded, "Still waiting for domestic suppliers to quote." Ex. 2 (ADAMS0005673). She then followed up, "Your fax cover sheet specifies ITAR compliance. The print does not call out ITAR and, as you know, we have not supplied ITAR parts to you in the past. If you want me to quote Chinese parts as we have done in the past please let me know." *Id.*

One month later, in January 2011, Mr. Barga sent Ms. Langford a quotation request for FP24018P1, which included a government contract number and DPAS rating. *See* Ex. 3 (ADAMS0005767, -5768). Ms. Langford sent the technical specifications for the FP24018P1 magnet

---

[2] As a first-pass review, the presentation below is based on Quadrant's best understanding of the evidence within the limited time period that this motion is being brought. Quadrant is moving quickly in an effort to remedy prejudice to its case as rapidly as possible.

[3] Adams was represented in the production by a different attorney from Holland & Knight LLP. The law firm instituted a formal ethics wall for that attorney and her team immediately after the government notified Quadrant's counsel in 2023.

[4] All exhibits have been filed under seal.

(its dimensions and grade) via email to X-Mag, apparently among other bidders. *See* Exs. 4, 5 (ADAMS0005763, -5764). Ms. Langford then responded to Mr. Barga with a proposal, describing the magnet as "ITAR COMPLIANT." Ex. 6 (ADAMS0005758).

In April 2011, Mr. Barga emailed Ms. Langford that GE would require vendors to identify the "Country of Origin" of their parts and to confirm compliance with the Buy America Act. Ms. Langford replied, "Unless your order specifies ITAR the parts are complete from China. . . . We have quoted you ITAR compliant parts before but I don't believe you ever purchased them due to the cost. Therefore, everything we have supplied you has come complete from China." Ex. 7 (AD-AMS0002386).

A few days later, Mr. Barga asked for a quote on a different magnet, 36A220770P1. This is the magnet that became an issue later. Ms. Langford asked, "DFAR or NON DFAR?" Ex. 8 (ADAMS0002038). Mr. Barga responded, "Please quote both ways. I believe NON is acceptable for this order." *Id.*

In another transaction, at Mr. Barga's request Ms. Langford gave a magnet quote and noted "Country of Origin: China." Ex. 9 (ADAMS0005562). Mr. Barga followed up a few months later asking if Adams had any extras. *Id.* GE Aviation received the same part in 2013, with Mr. Barga asking and Ms. Langford telling him its country of origin is China. *See* Ex. 10 (ADAMS0005519, -5523). The accompanying inspection sheet states at the top, "X-Mag." *Id.* With the limited time to review, Quadrant has not yet ascertained whether GE Aviation or the government would contend that this part was ITAR- or DFARS-controlled.

In March 2014, Ms. Langford sent to Michelle Qian and X-Mag's owner a technical drawing of the FP24018P1 magnet, albeit changed in the same way Quadrant had by redrawing it and placing their own company's name on it. *See* Ex. 11 (ADAMS0005774), -5775). Ms. Langford

then quoted a price to Mr. Barga, stating that it was "ITAR compliant." Ex. 12 (ADAMS0005770, -5773).

In August 2017, just like with Quadrant, Jay Babler and others at GE Aviation began asking Adams about its compliance with DFARS and ITAR. Internal communications at Adams are revealing. Ms. Langford wrote a colleague, "We have quoted this part DFAR compliant in the past but they continued to order as non DFAR (I have e-mail history)." Ex. 13 (ADAMS0002111). Ms. Langford wrote again later, "Since Marvin indicated Chinese suppliers and we indicated China as the country of origin I don't believe those legends [apparently pertaining to DPAS and DFARS] weren't reviewed any further." Ex. 14 (ADAMS0002218). And in response to GE Aviation's concerns about the 36A220770 print, Adams's Bob Kolpin responded to GE Aviation's attorney, Laura Molinari, with a powerful rebuttal that echoes Quadrant's defense in this case:

Per your request, I am forwarding the attached prints to you. The first is the original print from Leland (which was last updated in 1990) and the second is the Adams print. The Adams print is the one that we would have initially forwarded to our supplier the first time they made the parts for us. After that, because there have been no changes to the Leland print since 1990, we would not have included the print with our P.O. Our last P.O. to our supplier was in May 2015.

I would like to summarize our current position in this matter:
- In response to our salesperson's direct question about using a Chinese supplier or a domestic supplier, your buyer (Marvin Barga) clearly instructed Adams to purchase these parts from the Chinese supplier (email dated Jan. 30, 2015).
- Our Quote clearly states the country of origin as China.
- The GE Purchase Orders do not include any restrictions such as ITAR or other military use restrictions.
- The attached Leland print (last revision 1990) does not include any statements about ITAR or any other restrictions.
- Therefore, based on this information, it is Adams' position that we followed the instructions from GE in supplying this part.

Ex. 15 (ADAMS0002271).

All the material described above is new to Quadrant. It did not have information concerning Adams's export of FP24018P1 specifications or the connection to X-Mag and its personnel. Nor did Quadrant have so fulsome a picture of Adams's and GE Aviation's interactions over the years, Mr. Barga's approvals, and Adams's side of the story when GE Aviation began to investigate Adams as well. And most importantly, taking the new documents as a whole, they now present a

narrative and a defense that is strikingly similar to Quadrant's, thus corroborating everything Quadrant would have shown the jury so far.[5]

### 2. Electron Energy Corporation and Steve Walmer.

On December 13, 2024, the government moved for leave to take Mr. Walmer's testimony via Rule 15 deposition due to health concerns. (*See* D.N. 210 at 1.) The government's motion noted that in August and September 2017, Mr. Walmer exchanged emails with Mr. Phil Pascoe regarding a request for a cost quote that Mr. Pascoe submitted to Electron Energy. (*See id.* at 3–4.) The government contended that Mr. Walmer's testimony would be probative of Mr. Pascoe's knowledge of ITAR and DFARS requirements, and Quadrant's capabilities. (*Id.* at 3–4, 7.) At the deposition, Mr. Walmer's testimony went beyond his brief communications with Mr. Pascoe and, instead, included expert opinion testimony on the nature, purpose, and scope of the DFARS and ITAR, as explained in Quadrant's response to the government's motion in limine and request to limit the admission of Mr. Walmer's testimony (D.N. 344). *See* Depo. Tr. 11:16-12:2; 12:12-13; 13:8-10; 35:15-17; 40:1-4.

Most importantly, Mr. Walmer also testified that magnet part numbers FP24018P1 and 36B423718P1 are ITAR-controlled and invariably subject to the domestic sourcing restrictions imposed by the DFARS Specialty Metals Clause. *See id.* at 29:6–15; 33:14–24.

---

[5] Quadrant had some information previously pertaining to Adams. For instance, that information included an approval from Mr. Barga in 2015 for Adams to use its "normal Chinese supplier" for part 36A220770P1, Ex. 16 (also available at ADAMS0002247); a statement from Ms. Langford to Jay Babler during GE Aviation's 2017 investigation that "we have supplied this particular part to you for years . . . . But you (GE Aviation) chose to order non-DFAR compliant material," Ex. 17 (also available at ADAMS0002111); a recap of a meeting between GE Aviation and Adams Magnetics in which Simon Lopez acknowledged that military magnet 36A220770P1 "has been procured from Chi-na for 14+ years that we have done business with Adams Magnetics," Ex. 18 (USA-113539); direction from Jay Babler to Adams Magnetics to destroy documents in China, Ex. 19 (USA-REL-0013587); and three pages of NCIS interview notes of Ms. Langford, Ex. 20 (USA-00605, USA-QUADRANT-011222).

The government's Friday production contained 53 documents related to Electron Energy. Several of those documents contain Jencks statements of Mr. Walmer that would have been material to his deposition testimony and related *Brady* material that Quadrant would have used to impeach Mr. Walmer had it been timely produced. The Jencks material includes emails from Mr. Walmer in his capacity as Electron Energy's cost estimator to GE Aviation providing quotes for magnet part numbers FP24018P1 and 36B423718P1. *See* Ex. 21 at 4–5 (Electron Energy quote 33304 for FP24018P1); Ex. 22 at 12 (Electron Energy quote 32247 for 36B423718P1).) Certain communications are contemporaneous with Mr. Walmer's interactions with Mr. Pascoe in August and September 2017, about which he testified at length during his deposition. *See* Ex. 22 at 12 (Mr. Walmer emailing GE Aviation Electron Energy's quote 32247 on August 22, 2017 for part number 36B423718P1).) The related Brady material includes Electron Energy "Contract PO Release Forms" related to quotes Electron Energy provided to GE Aviation in 2017 and 2018 for magnet part numbers FP24018P1 and 36B423718P1 that indicate these parts are not ITAR-controlled and do not require a license to export, contrary to Mr. Walmer's assertions at his deposition. *See* Ex. 21 at 17 (regarding Electron Energy quote 33304), 28 (quote 32288), 49 (quote 32207), 51 (quote 32229); Ex. 22 at 17 (Electron Energy quote 32247), 32 (updated quote 32247), 45 (quote unnumbered).

One of the forms also indicates that magnet 36B423718P1 is not subject to the DFARS Specialty Metals Clause, further contradicting Mr. Walmer's testimony. *See* Ex. 22 at 45. The release forms associated with Electron Energy quotes 33304 and 32247 relate to the previously undisclosed emails Mr. Walmer sent to GE Aviation providing those quotes. *See* Ex. 21 at 4–5 (Walmer emailing quote 33304 to GE Aviation), 17 (release form for quote 33304 showing that FP24018P1 was not ITAR-controlled and no export license was required); Ex. 22 at 12 (Walmer

emailing quote 32247 to GE Aviation), 17 (release form for quote 32247 showing that 36B423718P1 was not ITAR-controlled and no export license was required).

The *Brady* and *Giglio* materials also include the GE Aviation purchase orders referenced on the Electron Energy release forms. *See* Ex. 21 at 19–23, 30–36, 53–54; Ex. 22 at 19–27, 34–40. Certain of these purchase orders show that they do not relate to a federal government contract, so the Specialty Metals Clause could never apply. *See* Ex. 21 at 30–36 & 53–54. Moreover, the orders were small purchases below the simplified acquisition threshold, so they were exempt from the restriction on acquisitions of specialty metals such that the Specialty Metals Clause did not apply. *See* 10 U.S.C. § 2533b(f) ("Exception for Small Purchases") (2018); *see also* 48 C.F.R. § 225.7003-5. This too would have been impeaching material for Mr. Walmer, and exculpatory material for Quadrant by demonstrating that the contract for which Quadrant was fulfilling orders (and which Electron Energy was explored as a substitute for) did not have Specialty Metals Clause obligation.

## STANDARD OF REVIEW

*Brady* and Jencks material must be disclosed in time to allow for their effective use at trial. *United States v. Presser*, 844 F.2d 1275, 1285 (6th Cir. 1988). *Under Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* material includes impeachment materials. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). In cases of delayed disclosure, the relevant question is whether a delay causes prejudice. *United States v. Spry*, 238 F. App'x 142, 147 (6th Cir. 2007). Whether a delay causes prejudice follows the materiality inquiry: evidence is material if "there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Spry*, 238 F. App'x 142, 147 (6th Cir. 2007) (citing *Bagley*, 473 U.S. at 682). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Bagley*, 473 U.S. at 682. The remedy for a *Brady* violation is a new trial. *United States v. Paulus*, No. 20-6017, 2021 WL 3620445, *3 (6th Cir. Aug. 16, 2021).

The Jencks Act requires the United States to produce any statement of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. 18 U.S.C. § 3500(b). The Jencks Act provides for striking the witness's testimony and proceeding unless the interests of justice require that a mistrial be declared. *Id.* at (d). In cases of inadvertent Jencks violations trial court may apply "such a remedy as the justice of the case might require under the circumstances." *United States v. Pope*, 574 F.2d 320, 327 (6th Cir. 1978).

## ARGUMENT

### 1. The previously undisclosed evidence is *Brady*, *Giglio*, and Jencks, and the lack of disclosure is prejudicial.

#### 1.1    The Adams Magnetics evidence.

The *Brady* doctrine is based on the tenet "that it is fundamentally unfair for the government to achieve a conviction through the concealment of evidence which undermines the strength of the government's case against the defendant." *Presser*, 844 F.2d at 1283. The government contends that Quadrant employees intentionally defrauded GE Aviation by concealing that they manufactured magnets in China, including by concealing that they necessarily sent manufacturing information to X-Mag in China. Quadrant has countered that GE Aviation knew of and authorized the Chinese sourcing of its magnets.

The government's evidence related to Adams corroborates Quadrant's defense. Adams engaged in a similar course of conduct with GE Aviation for years. Like Quadrant, Adams disclosed

to GE Aviation its magnets' country of origin as China. Like Quadrant, Adams necessarily sent magnet specifications to China in order to get accurate quotes and, of course, to actually make the magnets. Like Quadrant, Adams worked with X-Mag and its owner. And like Quadrant, Adams was subject to GE Aviation's direction in 2017 to destroy documents and its attempts to revise history at the supplier's expense.

This evidence is exculpatory. It strengthens Quadrant's defense that GE Aviation knew and approved of Quadrant's actions as part of an ongoing business relationship, thus negating any bad intent on Quadrant's part and a so-called "magnet production scheme." *Cf.* 18 U.S.C. § 1343 (must prove that the defendants "devised or intend[ed] to devise any scheme or artifice to defraud"). The same Mr. Barga who blessed Quadrant's actions also blessed Adams's. It shows a consistent pattern of conduct by GE Aviation with its suppliers. In short, it shows that Quadrant's defense is true.

The evidence also corroborates Quadrant's defense that Quadrant's 2017 letter to GE Aviation and GIDEP submissions were not intended to mislead GE Aviation or the government but were instead written at GE Aviation's direction as part of the larger company's efforts to deflect blame onto Quadrant despite its knowledge all along that the magnets came from China. As it did with Quadrant, GE Aviation investigated Adams as well. GE Aviation made those inquiries repeatedly despite GE's knowledge and approval that Adams's magnets came from China. Here, too, this demonstrates a consistent pattern by GE Aviation.

The evidence also includes Jencks statements from GE Aviation witnesses Marvin Barga and Simon Lopez. *See* Ex. 2 (ADAMS0005673); Ex. 7 (ADAMS0002386); Ex. 12 (ADAMS0005770); Ex. 24 (ADAMS0002094); Ex. 25 (ADAMS0002889); Ex. 26 (ADAMS0005514). Whether or not any single one of these documents is materially prejudicial on

its own, cumulatively as Jencks, and especially when fit together with the rest of the untimely *Brady* material disclosed, they certainly are.

Had Quadrant received this information in time for effective use at trial, it would have used it to devastating effect on GE Aviation witnesses Marvin Barga, Jay Babler, Simon Lopez, and Ronald Boeckman. Each could have been cross-examined at length and in detail about how GE Aviation knew and approved of Quadrant's course of dealing, including sending magnet specifications to China and supplying magnets from China, because GE Aviation was doing the same thing with another magnet supplier in Kentucky working with X-Mag. Each witness would have been cross-examined as well about the 2017 investigation and documents presented for Quadrant's signature in light of the similar review conducted of Adams. Quadrant would have also retooled its opening statement to make this powerful point.

### 1.2 The Electron Energy Corporation evidence.

The untimely disclosure of *Brady*/*Giglio* and Jencks material in this case directly relates to Mr. Walmer's deposition testimony. Mr. Walmer testified about his communications with Mr. Pascoe in August and September 2017 about an inquiry for magnet part numbers FP24018P1 and 36B423718P1 in his capacity as one of Electron Energy's cost estimators. *See generally* Depo. Tr. Specifically, he testified that he understood those parts to be ITAR-controlled and subject to the sourcing restriction imposed by the Specialty Metals Clause based on his interactions with Mr. Pascoe. *See id.* at 29:6–15; 33:14–24; 37:19–23; 133. Mr. Walmer indicated that his knowledge of whether such restrictions applied to a particular customer was based on representations made by the customer itself; he did not independently verify such requirements. *Id.* at 133. He also testified that he understood that GE was "the end user of these two parts[.]" *Id.* at 45:1–4. This understanding is further evidenced by his recently produced Jencks statements providing Electron Energy

quote 32247 to GE Aviation on August 22, 2017 for 36B423718P1. *See* Ex. 22 at 12 (Walmer sending quote 32247); *cf.* Ex. 23 at 3 (previously disclosed) (Walmer responding to Pascoe's inquiry to Electron Energy).)

Electron Energy's release forms associated with the quotes that Walmer sent to GE Aviation for the same parts about which he was in touch with Mr. Pascoe are annotated to show that Electron Energy did not consider them ITAR-controlled and no export license was required for them. *See* Ex. 21 at 17, 28, 49, 51; *see also* Ex. 22 at 17, 32, & 45. One release form also shows that Electron Energy did not consider part 36B423718P1 subject to the sourcing restriction imposed by the Specialty Metals Clause. Ex. 22 at 45. Mr. Walmer was likely aware of these release forms because they directly relate to the quotes he was responsible for preparing and, ultimately, sent to GE Aviation on Electron Energy's behalf. If Mr. Walmer's Jencks statements and the related *Brady* materials had been timely produced, Quadrant would have used them to impeach his deposition testimony.

The government intends to admit Mr. Walmer's testimony to try to show that Mr. Pascoe was aware of Quadrant's alleged obligations to comply with certain ITAR and DFARS requirements. Mr. Walmer's testimony, however, would have been undercut by Electron Energy's recently produced release forms. Furthermore, based on Mr. Walmer's testimony that he simply relied on the representations provided by Electron Energy's customers, Depo. Tr. at 133, Electron Energy's understanding as reflected on the release forms was likely informed by information relayed to it by GE Aviation. Quadrant would have cross-examined Mr. Walmer on that point. To the extent Mr. Walmer would have confirmed that Electron Energy's internal documents reflect information relayed to it by GE Aviation regarding the two magnet parts at issue, the documents are exculpatory and directly contradict the government's assertions during its opening statement

14

and testimony elicited from GE Aviation witnesses on direct examination. Instead, Electron Energy's internal documents and testimony Quadrant likely would have elicited from Mr. Walmer are consistent with representations GE Aviation made to Quadrant in May 2017 that at least magnet part number FP24018P1 was not ITAR-controlled and no license was required to export its associated drawings ahead of production in China.

Specifically, Quadrant would have impeached Mr. Walmer with the release form for Electron Energy quote 32247. That quote was sent to GE Aviation on August 22, 2017—the same day Mr. Walmer began communicating with Mr. Pascoe. *See* Ex. 22 at 12. The release forms for that quote (dated August 30, 2017 and September 1, 2017, respectively) both indicate that part number 36B423718P1 was not ITAR-controlled and no export license was required. *Id.* at 17, 32. From Mr. Walmer's deposition testimony about his understanding of specific operative restrictions and requirements, these release forms likely reflect GE Aviation's guidance to Electron Energy. Moreover, Mr. Walmer likely was aware of these documents (which reference the quote he transmitted to GE Aviation) given his position as Electron Energy's cost estimator. These documents tend to show that Electron Energy and Mr. Walmer understood that 36B423718P1 was not ITAR-controlled, notwithstanding anything Mr. Pascoe allegedly suggested to the contrary. This impeachment would have undermined Mr. Walmer's deposition testimony and diminished its usefulness to the prosecution.

Quadrant would have similarly used the other release forms in the government's untimely production to further impeach Mr. Walmer. The release form for Electron Energy quote 33304 for FP24018P1, dated June 29, 2018, indicates that the part is not ITAR-controlled and no export license is required. *See* Ex. 21 at 17. Likewise for the release forms for Electron Energy quotes 32207 and 32288, also for FP24018P1 and dated August 17, 2017 and September 12, 2017,

respectively—contemporaneous with Mr. Walmer's communications with Mr. Pascoe. *See id.* at 28. The release form for Electron Energy quote 32229 for part 36B423718P1, dated August 17, 2017, is similarly annotated to show that the part was not ITAR-controlled and no license was required. *Id.* at 51. Finally, the release form associated with an unnumbered Electron Energy quote for part 36B423718P1, dated November 21, 2017, indicates the part is both not ITAR-controlled and not subject to the sourcing restriction in the Specialty Metals Clause. (Ex. B at 45.) Quadrant expects Mr. Walmer's responses to its questions about these release forms would have confirmed that GE Aviation told Electron Energy that the two magnet parts were not ITAR-controlled, which is consistent with exculpatory evidence Quadrant will present in its defense.

Furthermore, had Quadrant had the GE Aviation purchase orders, it would have cross-examined Mr. Walmer on the inapplicability of the Specialty Metals Clause to the small purchases GE Aviation made with Electron Energy, either because the orders by their terms did not relate to a federal government contract or because of the purchase price. *See* 10 U.S.C. § 2533b(a) & (f) (2018); 48 C.F.R. 225.7003-2; 7003-3(a)(1). For example, the release form associated with Electron Energy quote 32288 shows an associated GE Aviation purchase order number 900127583. *Id.* at 28. That purchase order shows that none of its fourteen shipments of FP24018P1 relate to a government contract, so the restriction on acquisitions of specialty metals and its implementing Specialty Metals Clause were inapplicable to the purchase order. *See id.* at 30–36. The annotation on the release form associated with Electron Energy quote 32288 that the Specialty Metals Clause applied was incorrect. *See* Ex. 22 at 17.

Another example is the release form for Electron Energy quote 33304 which shows an associated GE Aviation purchase order numbered 900161746. Ex. 21 at 17. That purchase order is a mixed purchase order for both government and commercial opportunities. At most, then, the

Specialty Metals Clause could hypothetically have only applied to the specific shipments in the purchase order that related to government contracts (shipments 1, 3, and 4). *See id.* at 19–24. Even then, however, the total dollar value of the order was only $69,360.80, well-below the Simplified Acquisition Threshold of $250,000 operative as of the date of the order (June 22, 2018). The annotation on the associated release form was therefore incorrect, or least needed further qualification. *Id.* at 17. Quadrant's questioning of Mr. Walmer with this impeachment evidence would have undercut his testimony about the blanket applicability of the Specialty Metals Clause "for certain customers" and highlighted his unreliability on such matters. *See* Tr. at 91:1–3 ("There are certain customers that everything is DFARS restricted that comes across to us.").)

In the aggregate, this additional cross-examination would have seriously impeached Mr. Walmer's lack of credibility, such that the government would not present his testimony to the jury or the jury would discount his testimony. As such, Quadrant was prejudiced by the denial of its opportunity to cross-examine Mr. Walmer on these matters.

## 2. The Court has available several appropriate remedies for the suppression of Jencks and *Brady*/*Giglio* material.

Courts can sometimes implement measures during trial to remedy untimely disclosure of *Brady* or Jencks material. *See Spry*, 238 Fed. Appx at 149–50 (citing examples of remedies for delayed *Brady* disclosures where witnesses are given opportunities to review newly-disclosed material and re-cross witnesses). Likewise, Jencks remedies include recalling witnesses, striking testimony, or declaring a mistrial. *See, e.g.*, *United States v. Taylor*, 13 F.3d 986, 990 (6th Cir. 1994) ("the trial court has the discretion to formulate remedies as justice requires under the circumstances of the case") (citing *United States v. Pope*, 574 F.2d 320, 325–26 (6th Cir. 1978)). Even in this case, the parties were able to remedy the late disclosure of Special Agent Andrew Burden's contemporaneous report of an interview with Phil Pascoe through an additional opportunity for cross-

examination. But unlike a limited nondisclosure such as Mr. Burden's report, the present scenario involves over 13,000 pages of material disclosed mid-trial. Quadrant's counsel has devoted significant resources to try to understand and begin incorporating this material, distracting from its other trial-preparation efforts. And of course, the material pertains to several witnesses who have already testified. Quadrant thus offers three remedies for the Court's consideration:

**Option 1**. The Court will strike all testimony and evidence in the case concerning GE Aviation and instruct the jury that it must disregard any of the evidence previously admitted. This will include any evidence concerning Quadrant's August 7, 2017 letter to GE Aviation and the GIDEP notices. The Court also will strike the testimony of Mr. Walmer.

**Option 2.** The Court will permit Quadrant to (i) present a new opening statement to the jury; (ii) recall the witnesses who have testified for additional cross-examination; (iii) strike the testimony of Mr. Walmer, who cannot be feasibly recalled during trial; (iv) order the immediate disclosure of any additional Jencks, Brady, Giglio, and other such material; and (v) instruct the jury that the Court is essentially restarting the case because the government failed to produce relevant records in a timely manner as the law requires.

**Option 3.** The Court will declare a mistrial.

## CONCLUSION

For the reasons stated, Quadrant respectfully requests that its motion be granted.

March 16, 2025

Respectfully submitted,

By: */s/ John Brownlee*
John L. Brownlee (*pro hac vice*)
William F. Gould (*pro hac vice*)
Timothy J. Taylor (*pro hac vice*)
Ashley Akers (*pro hac vice*)
HOLLAND & KNIGHT LLP
1650 Tysons Blvd., Suite 1600
Tysons, VA 22201
T: 703.720.8053
F: 703.720.8610
John.Brownlee@hklaw.com
William.Gould@hklaw.com
Timothy.Taylor@hklaw.com
Ashley.Akers@hklaw.com

*Counsel for Quadrant Magnetics, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2025, the foregoing was electronically filed with the Clerk of the Court via the CM/ECF system, which sent a notice of electronic filing to the attorneys of record.

/s/ *John Brownlee*